# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | | |
|---|---|---|
| **RANDAL NELSON,** | ) | No. 6:11-cv-00084-SI |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**SIMON, District Judge.**

Randal Nelson seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for Social Security Disability Insurance benefits and Supplemental Security Income benefits. Because the Administrative Law Judge ("ALJ") did not provide clear and convincing reasons for rejecting the opinions of Mr. Nelson's treating and examining physicians or for discrediting Mr. Nelson's own testimony, the Commissioner's decision is vacated and this case is remanded for the calculation of benefits.

## BACKGROUND

### I.    The Application

Mr. Nelson was employed as a sheet metal journeyman and foreman for an HVAC company for nearly thirty years. Tr. 166. Mr. Nelson underwent back surgery in 2000 to correct degenerative spondylolisthosis at L4-5, during which pedicle screws and rods were used to fuse together vertebra in his lower back. Tr. 383. After this surgery, Mr. Nelson's employer moved him into an estimator position, which he held until his job was eliminated in January 2007, when Mr. Nelson was sixty-one years old.[1] Tr. 55-56, 197. Due to his coronary artery disease, Mr. Nelson had cardiac stent placements in 2003 and 2004. Tr. 396-397. In February 2004, following a workplace injury, Mr. Nelson had left shoulder arthoroscopy to repair his rotator cuff. Tr. 321. His rotator cuff was re-torn in a June 2004 car crash, leading to a second shoulder surgery in October 2005. Tr. 311, 321. Mr. Nelson, who is diabetic, also suffers from bilateral foot numbness as a result of diabetic neuropathy. *See* Tr. 479.

Mr. Nelson continued to experience back and related leg pain, for which he sought medical assistance in February 2004, June 2005, and February 2006. Tr. 360, 381, 383. After a CT/myelogram revealed a large lateral disc herniation at L3-4 that was compressing the L4 nerve root, Mr. Nelson underwent a second back surgery in October 2006. Tr. 376. In February 2007, Mr. Nelson reported to both his primary care physician, Samuel Fellin, D.O., and his neurologist, Jeffrey Johnson, M.D., that he was again experiencing significant back pain. Tr. 323, 375. The pain, which continued down his right leg, made it hard for him to walk or bear weight on his right side. Tr. 375. Tests confirmed another abnormality at L3-4 with foraminal narrowing (*i.e.*,

---

[1] Mr. Nelson was born October 10, 1945. Tr. 161.

pinching of the nerves). Tr. 365, 367-368. Dr. Johnson opined that significant surgery would be required to correct what appeared to be a recurrent disc herniation, but he also assessed that Mr. Nelson was not a good candidate for such a procedure. Tr. 365. He concluded that Mr. Nelson was disabled. *Id.* In August 2007, Dr. Fellin opined that Mr. Nelson "really needs to get spinal fusion" and was currently unable to return to work. Tr. 443.

Mr. Nelson filed his applications for Supplemental Security Income benefits and Social Security Disability Insurance benefits in May 2007. Tr. 134, 137. He reported that his disabling conditions included "Rods & screws in lower back, lumbar decompression & fusion l-4 l-5, disc herniation l-3 l-4, left shoulder rotator cuff, diabetic neuropathy, stints in heart, angina, high blood pressure, sleep with c-pap machine." Tr. 165. His alleged onset date for his disabilities was January 23, 2007, which was the day he lost his job as a sheet metal estimator. *See* Tr. 134, 137.

The ALJ held a hearing and denied Mr. Nelson's claim on May 20, 2009. Tr. 23. The Appeals Council denied Mr. Nelson's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1. Mr. Nelson now seeks judicial review of the ALJ's decision.

## II.    The Sequential Analysis

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v.*

*Commissioner*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520). The *Keyser*

court described the five steps in the process as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments described in the regulations? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.*at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)).

The claimant bears the burden of proof for the first four steps in the process. If the

claimant fails to meet the burden at any of those four steps, then the claimant is not disabled.

*Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001); *see also Bowen v. Yuckert*, 482

U.S. 137, 140-41 (1987); 20 C.F.R. § 404.1520 (setting forth general standards for evaluating

disability).

The Commissioner bears the burden of proof at step five of the process, where the

Commissioner must show the claimant can perform other work that exists in significant numbers

in the national economy, "taking into consideration the claimant's residual functional capacity,

age, education, and work experience." *Tackett v. Apfel,*180 F.3d 1094, 1100 (9th Cir. 1999); *see*

*also* 20 C.F.R. § 404.1566 (describing "work which exists in the national economy"). If the

Commissioner fails to meet this burden, then the claimant is disabled, but if the Commissioner

proves the claimant is able to perform other work which exists in the national economy, then the

claimant is not disabled. *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R. §§ 404.1520(f),

416.920(f); *Tackett*, 180 F.3d at 1098-99).

OPINION AND ORDER, Page 4

### III.    The ALJ's Decision

The ALJ applied the sequential analysis in her decision of May 20, 2009. At step one, the ALJ found that Mr. Nelson met the insured status requirements of the Social Security Act through September 30, 2011, and that he did not engage in substantial gainful activity from the alleged onset date of January 23, 2007. Tr. 17. At step two, she found that Mr. Nelson has a severe combination of impairments consisting of "degenerative disc disease of the lumbar spine with herniation at L3-5, a history of left shoulder rotator cuff injury, and diabetes mellitus with diabetic peripheral neuropathy." *Id.* She held that Mr. Nelson's coronary artery disease and sleep apnea are adequately controlled by treatment and are not severe impairments. Tr. 17-18. At step three, the ALJ found that Mr. Nelson does not have an impairment or combination of impairments that meets or equals one of the listed impairments. Tr. 18.

The ALJ then found that Mr. Nelson has the following residual functional capacity ("RFC"):

> …to sit at least six hours in an eight-hour workday, two hours at a time, with normal breaks. He can stand and walk two hours in an eight-hour workday, approximately 10 minutes at a time. He can lift 10 pounds. He can perform postural activities occasionally, i.e., up to one-third of the workday. He can perform squatting, crouching, kneeling, or crawling rarely, i.e., one to five percent of the workday. He should avoid ladders, scaffolds, and ropes. He should avoid overhead lifting. He can perform occasional overhead reaching and all other manipulative activities. He should be able to use a cane with walking. However, he does not need the cane for standing or leaning on a table. He should avoid unprotected heights, moving machinery, hazards, and vibration.

Tr. 18. In reaching this determination, the ALJ considered Mr. Nelson's testimony but found that it was not fully credible. Tr. 19. She noted Mr. Nelson's self-reporting to doctors through 2007 and 2008 did not consistently include the symptoms and degree of pain he alleged during his

testimony. *See* Tr. 20. The ALJ noted that Mr. Nelson did not leave his last job for health

reasons; she also noted that his alleged onset date was the same day he was laid off, yet "[h]e

testified that he would have continued working if he were not laid off." Tr. 21. She also

remarked that the activities of daily life described by Mr. Nelson and his wife, Caren Nelson,

"were inconsistent with complete incapacity." *Id.* In addition, the ALJ gave little weight to the

opinion of Dr. Johnson, who opined in March 2007 that he considered Mr. Nelson to be disabled.

Tr. 19. She gave weight to some of the treatment records of Dr. Fellin, but not to his assessments

that Mr. Nelson was unable to work, which she found contradicted contemporaneous records of

his examinations of Mr. Nelson. *See* Tr. 20-21. She also accepted some but not all of the opinion

of Lawrence Andes, P.T., who examined Mr. Nelson in March 2009. Tr. 21. In particular, she

rejected Mr. Andes' conclusion that Mr. Nelson could not work more than four hours a day. Tr.

21.

    At step four, the ALJ found that Mr. Nelson could still perform his past relevant work as

a sheet metal estimator. Tr. 22. She noted that Mr. Nelson described his prior work as requiring

medium exertion, but relied on the testimony of a vocational expert ("VE"), who explained that

the Dictionary of Occupational Titles ("DOT")[2] classifies the job of sheet metal estimator as

requiring only sedentary exertion. *Id.* The ALJ acknowledged Mr. Nelson's concern that he

lacked the computer training to perform the job of sheet metal estimator as it is normally

performed; she relied, however, on the VE's testimony that some of the software programs used

to create estimates "are very user friendly." *Id.* The ALJ thus concluded that Mr. Nelson could

---

[2] DOT is a publication of the U.S. Department of Labor that gives detailed requirements for a variety of jobs. The Social Security Administration has taken administrative notice of the DOT. *Massachi v. Astrue*, 486 F.3d 1149, 1153 n.8 (9th Cir. 2007).

return to work as a sheet metal estimator. Based on these findings, the ALJ found that Mr.

Nelson was not disabled.

## ANALYSIS

### I.    Standard of Review

The court must affirm the Commissioner's decision if it is based on the proper legal

standards and the findings are supported by substantial evidence.  *Hammock v. Bowen*, 879 F.2d

498, 501 (9th Cir. 1989).  Substantial evidence is "more than a mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*,

305 U.S. 197, 229 (1938)).  "However, a reviewing court must consider the entire record as a

whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Orn*

*v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880,

882 (9th Cir. 2006) (quotation marks omitted)). Where the evidence is susceptible to more than

one rational interpretation, the Commissioner's conclusion must be upheld.  *Sample v.*

*Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982). The reviewing court may not affirm the

Commissioner on a ground upon which he did not rely. *Orn*, 495 F.3d at 630.

### II.    Step Two Finding of Severe Impairment

Mr. Nelson argues that the ALJ should have included his sleep apnea as a severe

impairment at step two of the sequential analysis. At step two, "an impairment or combination of

impairments is considered 'severe' if it significantly limits an individual's physical or mental

abilities to do basic work activities." SSR 96-3p, 1996 WL 374181 (July 2, 1996). There was

minimal evidence in the record from which the ALJ could have concluded that Mr. Nelson's

sleep apnea was a severe impairment that could not be adequately managed through treatment. In his disability applications and initial interviews, Mr. Nelson did not mention that his sleep apnea disrupted his daytime activities; he only mentioned that he slept with the assistance of a CPAP mechanism. *See, e.g.*, Tr. 165. The medical records submitted do not contain any active treatment notes about Mr. Nelson's sleep condition, much less do they indicate any work-related limitations resulting from that impairment. *See Carmickle v. Commissioner*, 533 F.3d 1155, 1165 (9th Cir. 2008).

Mr. Nelson points to his testimony that "I have sleep apnea so at times if I'm sitting there, like on the computer writing a letter I can accidentally hit the delete and fall asleep and delete the whole letter or backspace the whole letter. I do fall asleep if I'm sitting still trying to concentrate." Tr. 62. This comment does not carry Mr. Nelson's burden at step two of establishing that a medically determinable impairment has significantly limited his ability to do basic work activities. Before this court, Mr. Nelson asserts that the record "is replete with references to hypersomnia induced by sleep apnea," but he provides no citations to the record, and the court has found no reference other than Mr. Nelson's passing comment at the hearing and a remark in his function report. *See* Tr. 187 ("I nod off when sitting still."). Considering the record as a whole, the ALJ did not err in concluding that Mr. Nelson's alleged inability to remain awake was not the result of a severe impairment.

Further, even if the ALJ erred in concluding that Mr. Nelson's sleep apnea was not a severe impairment at step two, that error was harmless. Step two primarily serves as a screening device to weed out groundless claims. *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). Because the ALJ still resolved step two in Mr. Nelson's favor, any error in enumerating the

severe impairments did not prejudice Mr. Nelson. *See Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005). There is also no indication that the ALJ failed to consider Mr. Nelson's sleep apnea at subsequent stages of the sequential analysis. At step four, the ALJ stated that she "had considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." Tr. 18. She also noted Mr. Nelson's testimony that "he has a tendency to fall asleep if he is sitting still." Tr. 19. While she did not otherwise explicitly address Mr. Nelson's sleep apnea in discussing the RFC, that most likely reflects the lack of medical evidence about this condition in the record. In sum, Mr. Nelson has not demonstrated that he was prejudiced by the ALJ's determination at step two that his sleep apnea was not a severe impairment.

## III.    Credibility Determination

Mr. Nelson challenges the ALJ's finding that his testimony was not credible. Mr. Nelson has produced objective medical evidence of an underlying impairment that could reasonably be expected to cause some degree of symptoms; therefore, the ALJ may reject Mr. Nelson's testimony about the severity of those symptoms only if he provides specific, clear and convincing reasons for doing so. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008).

The ALJ discredited Mr. Nelson's testimony because he engaged "in activities inconsistent with complete incapacity." Tr. 21. An ALJ may draw an adverse credibility finding from inconsistencies between the alleged severity of the claimant's symptoms and his self-reported activities. *See, e.g.*, *Valentine v. Commissioner*, 574 F.3d 685, 693 (9th Cir. 2009). There are two ways in which a claimant's activities of daily living can bear adversely on his

credibility: if they are inconsistent with the claimant's other testimony, or if they suggest skills transferable to a work place. *Orn*, 495 F.3d at 639. Neither ground is applicable here.

Mr. Nelson explained that he does light house work,[3] cooks dinner for his wife four nights a week, and goes grocery shopping on occasion. Tr. 184-185. He completes these tasks slowly and with rests. Tr. 182, 184. He can feed their pets, but his wife grooms them and takes them to the vet. Tr. 183. In the summer, he can mow their yard with a power mower, but his wife has to do the planting. Tr. 65, 184. He attends church and camps in a RV three or four times a year. Tr. 186. The ALJ found these activities inconsistent with a claim of "complete incapacity," but Mr. Nelson has never claimed to be utterly incapacitated. Rather, these activities are consistent with Mr. Nelson's description of pain when bending, lifting, stopping, crouching, squatting, stair climbing, kneeling, walking, standing, and reaching. *See* Tr. 185, 187; *see also* Tr. 61, 183. Further, as described by Mr. Nelson, these activities do not take up a substantial part of his day, *see Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001), nor are they the types of activities that are "easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication," *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). "[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations[.]" *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). "[T]he mere fact that a plaintiff has carried on certain daily activities … does not in any way detract from her credibility as to [his] overall disability." *Vertigan*, 260 F.3d at 1050; *see also Fair*, 885 F.2d at 603.

---

[3] He described in particular putting dishes in the dishwasher, dusting, and occasional vacuuming. Tr. 65, 184.

The ALJ also pointed to Mr. Nelson's testimony that he did not leave his last job because of his health, yet he claims his last day of employment as the onset date of his disability. *See* Tr. 21. Mr. Nelson's testimony on this point, however, was never inconsistent. He did not deny that he was laid off for non-medical reasons, and he explained more than once that he would have kept working if he had not been laid off and that he sought new work through his union. Tr. 52-53, 197. Although it appears unlikely that his last day of employment was in fact the onset date of his disability, that is a medical and legal determination for the Commissioner to make on the basis of the record; the claimant's erroneous calculation of that date does not necessarily render the claimant incredible.[4]

Finally, the ALJ suggested that the medical opinions in the record did not support Mr. Nelson's account. As discussed below, there was no direct conflict between Mr. Nelson's statements and the medical evidence. In addition, the ALJ "may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence." *Reddick*, 157 F.3d at 722; *see also Burch*, 400 F.3d at 681 (lack of medical evidence can support a finding of incredibility only if there are additional grounds for discrediting the claimant's testimony). Because the ALJ's other reasons for discrediting Mr. Nelson's testimony are not clear and convincing, any shortage of supporting medical evidence could not alone sustain the adverse credibility determination.

---

[4] In arguing that an adverse credibility determination can be premised on the fact that the claimant did not leave his or her last job due to medical problems, the government cites *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001), and *Drouin v. Sullivan*, 966 F.2d 1255 (9th Cir. 1992). These cases provide little factual background or close analysis, however, from which to distill a firm principle beyond the context of those cases.

In sum, the ALJ did not provide clear and convincing reasons for discrediting Mr. Nelson's testimony. The adverse credibility finding is therefore reversed.

## IV.    Medical Evidence

In addition to wrongly rejecting Mr. Nelson's testimony, the ALJ erred in discrediting the opinions of Dr. Johnson, Dr. Fellin, and Mr. Andes. Mr. Nelson's testimony and the medical records of his treating and examining physicians are all consistent, and they all indicate that Mr. Nelson is disabled.

In considering medical evidence, the Commissioner should give more weight to a treating physician's opinion than to an examining physician's, and more weight to an examining physician's opinion than a reviewing physician's. *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001). To reject the uncontroverted opinion of a treating or examining doctor, the ALJ must provide clear and convincing reasons supported by substantial evidence. *Ryan v. Commissioner*, 528 F.3d 1194, 1198 (9th Cir. 2008). While a physician's opinion on the ultimate issue of disability does not bind the Commissioner, the Commissioner may only reject such opinions based on clear and convincing reasons. *Reddick*, 157 F.3d at 725; *see also Rodriguez v. Bowen*, 876 F.2d 759, 762 (9th Cir. 1989) ("[T]he ALJ must give sufficient weight to the subjective aspects of a doctor's opinion. … This is especially true when the opinion is that of the treating physician."). If the doctor's opinion on disability is controverted by other substantial evidence in the record, it still may only be rejected for "specific and legitimate reasons." *Id.*

Dr. Johnson began treating Mr. Nelson in mid-2006, and he performed Mr. Nelson's second back surgery in October 2006. Reviewing Mr. Nelson's new test results in March 2007,

OPINION AND ORDER, Page 12

Dr. Johnson noted they showed "either postoperative changes or perhaps a small recurrent disk herniation on the right side [of] L3-4." Tr. 365. He explained that he and Mr. Nelson:

> discussed treatment options in great detail. My feeling is that if this does represent a recurrent disk herniation then surgical management will be difficult. If this is the case the implication is that he's had an early recurrence with little or no external trauma. I don't believe that a simple reoperative discectomy would be appropriate. I would feel that we would have to extend the existing fusion up to the L3-4 level. This would involve removing his present hardware and inserting new hardware extending up to the L3 level. Of course, this represents a significantly greater surgical intervention with a longer recovery period and greater risks. He is not in a position to undergo that type of surgery at present…. It's unlikely that any surgery is going to restore his ability to work, at the present time I would consider him to be disabled.

Tr. 365.

Dr. Fellin has been Mr. Nelson's primary care physician for more than ten years. In February 2007, he noted Mr. Nelson's "marked mechanical deformity and inability to use [his] shoulder," which "due to surgeries and injuries [Dr. Fellin] suspect[s] is [a] long term issue." Tr. 324. In August 2007, Dr. Fellin commented on Mr. Nelson's continuing problems with his back, remarking that "he has ongoing pain down legs and foot drop and we[ak]ness despite surgery." Tr. 406. Mr. Nelson's spinal stenosis was causing "significant neurogenic claudication and weakness … with loss of leg strength." *Id.*[5]  Regarding Mr. Nelson's back, Dr. Fellin recorded there was "limited [range of motion] with pain noted with standing." Tr. 443. Dr. Fellin concluded that he would continue Mr. Nelson's current pain control regimen, but Mr. Nelson "really needs to get spinal fusion" and "at this point couldn't return to work." *Id.* In October

---

[5] "Neurogenic claudication describes a combination of low back pain, leg pain, numbness, and motor weakness that starts or intensifies on standing or walking and is eased by sitting or lying down." David Snyder et al., *Treatment of Degenerative Lumbar Spinal Stenosis*, 70 Am. Family Physician 517 (2004).

2008, Dr. Fellin again noted Mr. Nelson's foot drop, unsteady gait, pain and weakness with lifting, and "bilateral biceps tendon rupture deformity," as well as worsening neuropathy affecting Mr. Nelson's feet. Tr. 475-476, 479. Regarding Mr. Nelson's musculoskeletal issues, Dr. Fellin concluded that, "due to his biceps tendon ruptures and his neuropathy as well as his failed back surgeries I think at this point he's not able to really return [to] any kind of fitful [sic] type of ongoing work." Tr. 475.

In March 2009, upon Dr. Fellin's referral, Mr. Andes conducted a thorough physical capacity evaluation of Mr. Nelson. Tr. 487. Mr. Andes felt that the examination results were a good estimation of Mr. Nelson's physical abilities for the reasons noted in the margin.[6] He concluded that "Mr. Nelson is limited to part time work (4 hours/day) in the SEDENTARY range of physical demand." *Id.* In particular, Mr. Andes assessed that Mr. Nelson could sit for no more than four out of eight hours, could stand for short intervals totaling no more than one hour, and could walk about for thirty minutes at a time for no more than two hours in total. Tr. 488. Regarding these particular findings, he noted that "Mr. Nelson is not considered to be capable of working full time in any capacity currently. He fatigues quickly and becomes short of breath with mild exertion. Work place tolerance is projected at 4 hours/day in Sedentary category jobs." Tr. 488.

---

[6] Mr. Andes noted that Mr. Nelson demonstrated a good level of effort "as evidenced by signs of muscular straining, recruitment of accessory muscles, postural breaks, shaking of the arms and legs, reddening of the face, and heavy breathing. He displayed moderate pain behaviors …. The pain behavior did not appear exaggerated or dramatic. … All of the reliability tests were graded as normal indicating valid test results. Mr. Nelson presented in a straight forward fashion, with no signs of symptom magnification observed." Tr. 487.

The ALJ rejected all three medical opinions to the extent they concluded Mr. Nelson was disabled. The reasons provided, however, are not clear and convincing, nor are they supported by substantial evidence.

First, the ALJ gave "little weight" to Dr. Johnson's assessment of disability in March 2007 on the grounds that that "Dr. Johnson did not report any specific functional limitations and provided no further rationale indicating what prevented the claimant from working. He also did not distinguish between inability to perform the claimant's past work or all work." Tr. 19. These are not convincing reasons for rejecting Dr. Johnson's opinion. That opinion was supported by objective medical tests and clinical observations, was based on an established treating relationship with the claimant, and included a clear explanation for why the claimant's back condition was serious but could not be effectively treated at that time. *See* Tr. 365. Given the lengthy medical documentation of Mr. Nelson's back and leg pain and difficulty walking, the functional limitations of concern to Dr. Johnson were clear, even if left implicit. Further, in his March 2007 report, Dr. Johnson specifically noted that Mr. Nelson had been laid off from work. *Id.* The subsequent conclusion that Mr. Nelson was incapable of work would therefore logically refer to all work, not specifically to Mr. Nelson's prior job.

The ALJ rejected Dr. Fellin's assessment of disability in August 2007 because "Dr. Fellin did not report any specific limitations and it appears he was referring to the claimant's past work which the claimant has described as requiring up to medium exertion. However, there is no indication that the claimant would not have been able to perform sedentary work with the other limitations described [in the RFC]." Tr. 20. To the contrary, Dr. Fellin specifically noted that Mr. Nelson had neurogenic claudication and weakness in his legs, and that his back had "limited

OPINION AND ORDER, Page 15

[range of movement] with pain noted with standing." Tr. 406, 443. These are specific limitations,

and they appear to contradict the ALJ's finding that Mr. Nelson could stand for up to two hours a

day. *See* Tr. 406, 443. Further, the ALJ's conclusion that Dr. Fellin was referring to the

claimant's past work is not logically inferred from Dr. Fellin's August 2007 notes. To the

contrary, in his October 2008 opinion, Dr. Fellin explicitly opined that Mr. Nelson could not

return to "any kind of fitful [sic] type of work." Tr. 475.

      The ALJ also rejected both of Dr. Fellin's disability findings (that of August 2007 and

that of October 2008) based on alleged contradictions with Dr. Fellin's examination notes.

Tr. 20-21. In doing so, the ALJ relied on checklists of physiological systems appended to each

visitation report. These checklists, however, often contradict the list of the claimant's current and

historical problems also included in each report. These generic and potentially automated

checklists cannot override the specific, descriptive findings and subjective opinions of the

doctors. *Cf. Holohan*, 246 F.3d at 1205 (ALJ erred in rejecting treating physician's opinion

where ALJ was "selective in his reliance on Dr. Oh's treatment notes" and "exaggerate[d] … his

description of their contents").

      The ALJ also relied on Mr. Nelson's failure to complain about his back, legs and

shoulders on each visit with his doctors, such as during appointments for sore throats, diabetes

consultations, and hypertension follow-ups. *See* Tr. 20-21. That Mr. Nelson did not always

complain on all occasions about his well-documented back, leg or shoulder pain is not a clear

and convincing reason to reject either Mr. Nelson's credibility or Dr. Fellin's repeated

assessment of disability. *Cf. Ryan*, 528 F.3d at 1200 (medical records are not inconsistent when

claimant described symptoms with more detail to specialist than to general practitioner); *Orn*,

495 F.3d at 634 ("The primary function of medical records is to promote communication and record-keeping for health care personnel—not to provide evidence for disability determinations. We therefore do not require that a medical condition be mentioned in every report to conclude that a physician's opinion is supported by the record."). Indeed, the whole purpose of a stable treating relationship is to alleviate the need for the patient to repeat his full litany of complaints on each visit to the doctor.

In sum, the ALJ erred by not reading the treatment notes within the context of the medical record as a whole. *See Holohan*, 246 F.3d at 1205. The record is replete with objective medical tests, clinical observations, and subjective evaluations all indicative of continuous back, leg, shoulder, and foot problems that severely impaired Mr. Nelson's ability to work. *Cf. Orn*, 495 F.3d at 633-34 (ALJ erred in rejecting opinions of two treating physicians which were consistent with each other, supported by contemporaneous medical tests, and based on significant treating relationships with the claimant).[7]

Finally, the ALJ purports to credit the assessment of Mr. Andes, but rejects Mr. Andes' finding that Mr. Nelson could not sustain full-time work. Tr. 21. The ALJ explained that "although Mr. Andes reported the claimant's work tolerance was limited [to] four hours per day, it is unclear how he made that determination. In his report he otherwise reported estimates indicating greater abilities, i.e., that the claimant could sit for four hours of an eight-hour workday, stand for one hour of an eight-hour workday, and move and walk about for two hours

---

[7] The court further notes that the ALJ's characterization of the medical record is at times too cursory. For example, the ALJ isolates a comment in the record of a diabetes/hypertension follow-up appointment that Mr. Nelson has "[n]o other complaints at this time." Tr. 20. But the treatment records for that visit also record an explicit conversation about Mr. Nelson's ongoing back problems and how he is unable to have surgery to alleviate that condition. Tr. 472.

of an eight-hour workday. While it is acknowledged that this also does not equate with a full eight-hour workday, it suggests that Mr. Andes['] opinions are not based on the claimant's *maximal* functional capacity as required by Social Security Regulations." *Id.* The record does not support the ALJ's conclusion. Mr. Andes clearly explained that, although he noted the possibility of four hours of sitting, one hour of standing and two hours of walking, he did not consider Mr. Nelson "capable of working full time in any capacity" because he "fatigues quickly and becomes short of breath with mild exertion." Tr. 488. The ALJ dismisses this explanation by pointing out that Mr. Nelson has not consistently complained of fatigue or shortness of breath. Tr. 22. That reasoning is specious. Mr. Andes did not opine that Mr. Nelson could only work part-time because he suffered from fatigue and shortness of breath; he opined that Mr. Nelson had significant back, leg and shoulder pain with limited mobility that prevented him from working full time, a fact evidenced by the shortness of breath and fatigue exhibited by Mr. Nelson during the occupational assessment. The ALJ also glosses over Mr. Andes' notations that Mr. Nelson reported constant pain that increased with "prolonged sitting, standing, or walking, and bending." *See* Tr. 490.

The ALJ presumably relied instead on the assessments of two reviewing doctors, completed in June and July of 2007. *See* Tr. 393-394. The assessment of Richard Alley, M.D., appears to be the only source in the record for the ALJ's conclusion that Mr. Nelson could sit for six out of eight hours. *See* Tr. 387. This opinion of a reviewing physician cannot override the two contrary opinions of Mr. Nelson's treating physicians and the result of Mr. Andes' thorough examination. *See, e.g.*, *Holohan*, 246 F.3d at 1207 (the opinions of an examining physician and a reviewing physician "are insufficient to outweigh the opinion of a treating physician who cared

OPINION AND ORDER, Page 18

for [the claimant] over a period of time and who provided an opinion supported by explanation and treatment records"). Further, Dr. Alley's review of the record was completed before both of Dr. Fellin's assessments of disability *and* Mr. Andes' occupational assessment. It is therefore based on a review of a fraction of the record now assembled.

The ALJ did not provide clear and convincing reasons for rejecting the opinions of Mr. Nelson's treating physicians, as well as the well-supported assessment of Mr. Andes. The Commissioner's decision therefore must be reversed and remanded. The only remaining question is whether this matter should be remanded for further proceedings or solely for the calculation of benefits.

## V.    Remand for Award of Benefits

While the usual course is to remand for further proceedings, this court may remand for an immediate award of benefits "when no useful purpose would be served by further administrative proceedings, … or when the record has been fully developed and there is not sufficient evidence to support the ALJ's conclusion." *Rodriguez*, 876 F.2d at 763. This court "should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits" when the following three conditions are met: "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004).

The Ninth Circuit has repeatedly credited evidence as true when the ALJ failed to provide clear and convincing reasons for discounting the testimony of the claimant and the opinion of the

claimant's treating and examining physicians. *See Orn*, 495 F.3d at 640; *Benecke*, 379 F.3d at 594; *Moisa v. Barnhart*, 367 F.3d 882, 887 (9th Cir. 2004); *Rodriguez*, 876 F.2d at 763. Because the ALJ did not provide clear and convincing reasons for rejecting the evidence of Mr. Nelson, Dr. Johnson, Dr. Fellin, and Mr. Andes, this court credits all of that evidence as true. As for the second factor, the record is fully developed. Finally, the credited opinions demonstrate that the claimant is unable to maintain gainful employment. It does not matter that the vocational expert did not address the precise limitations described in the now-credited opinions. *See Benecke*, 379 F.3d at 595. As in *Rodriguez*, the evidence in the record establishes that Mr. Nelson cannot work for more than four hours a day, even in a sedentary position. *See Rodriguez*, 876 F.2d at 763; *see also Benecke*, 379 F.3d at 596 (remanding for benefits where several treating physicians had opined that claimant could not  maintain employment). "Because the capability to work only a few hours per day does not constitute the ability to engage in substantial gainful activity, … remanding this case for further administrative proceedings would serve no useful purpose; rather, it would merely delay the award of benefits." *Rodriguez*, 876 F.2d at 763 (citation omitted). Thus the Commissioner's decision is reversed and remanded for the immediate award of benefits.

Finally, there is the matter of the onset date. Mr. Nelson has himself admitted that he was still capable and willing to work as of his alleged onset date of January 23, 2007. Where the record is clear and well-established and the court is otherwise remanding for the immediate award of benefits, it is not improper for the court to also determine the onset date of disability. *See Vertigan*, 260 F.3d at 1054. This court finds instructive Dr. Johnson's opinion of March 28, 2007, that Mr. Nelson suffered from a recurrent back problem that could not be corrected

through surgery and that would prevent him from working. *See* Tr. 365. The court therefore finds

that Mr. Nelson is disabled, and that the onset date of his disability is March 28, 2007.

## CONCLUSION

Because the court remands for the immediate award of benefits, there is no need to

address Mr. Nelson's additional arguments. For the reasons stated above, the Commissioner's

decision is REVERSED and REMANDED for the immediate award of benefits.

Dated this 6th day of April, 2012.


                                        /s/ Michael H. Simon
                                        Michael H. Simon
                                        United States District Judge

OPINION AND ORDER, Page 21